UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LILY ABEBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00148-JRS-TAB |
| | ) | |
| HEALTH AND HOSPITAL | ) | |
| CORPORATION OF MARION COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Motion for Summary Judgment**

Defendant Health and Hospital Corporation of Marion County, better known to Indianapolis residents as Eskenazi Health ("Eskenazi"), denied Plaintiff Lily Abebe a raise. Alleging discrimination based on her race and national origin, Abebe sued Eskenazi under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Eskenazi moves for summary judgment. (ECF No. 29.) For the following reasons, the motion is granted.

## I.     Background

### A.  *Grassy Creek Dental Clinic*

Lily Abebe began working for Eskenazi Health's Grassy Creek Dental Clinic as an expanded function dental assistant—a dental assistant trained in filling cavities—starting on November 10, 2014. (Abebe Dep. Tr. 49:6–17, ECF No. 34-2.) Abebe is a black woman. (Compl. ¶ 9, ECF No. 1.) She was born in Ethiopia, immigrated to the United States in 1989, and has lived here ever since. (Abebe Dep. Tr. 10:9–22, ECF No. 34-2.)

1

Three other dental assistants work at the Grassy Creek Dental Clinic: Richard Branham, a white man; Tracy Woodson, a black woman; and Daisy Sierra, a Hispanic woman. (*Id*. at 58:22–59:19.) Branham and Woodson are regular dental assistants, and Sierra is an expanded function dental assistant. (*Id*. at 59:20–23.)

Several people at Grassy Creek supervise Abebe and the other dental assistants. Abebe mainly reports to the clinic manager and the dental director. (*Id*. at 50:3–10.) The current clinic manager is Thrasher Carmichael. (*Id*. at 52:5–9.) Before him was Carlos Hernandez, and before Hernandez was Felgrace James. (*Id*. at 52:1–4.) Throughout Abebe's employment at Grassy Creek, the dental director has been Dr. Andrew Lane. (*Id*. at 53:9–19.) Abebe sometimes reports to the site coordinator, Leah Coe, who has held that position throughout Abebe's employment. (*Id*. at 66:16–19, 173:15–16.)

Several other non-supervisory employees at Grassy Creek bear mentioning. Dr. Raquel Salvador is another dentist at the clinic. (*Id*. at 54:3–4.) Lina Murff is a union representative who registers patients at Grassy Creek. (*Id*. at 67:10–20.) While Abebe has been at Grassy Creek, one or two dental hygienists have worked there. (*Id*. at 64:8–24.)

*B. 2015–2017*

Abebe receives an annual performance appraisal from Eskenazi. (*Id*. at 74:21–75:17.) Each performance review contains three metrics. First is "Eskenazi Health's Values," which assesses an employee's professionalism, respect, innovation, development, and excellence. (*E.g.*, ECF No. 29-2 at 34–35 (styling these criteria as

2

"PRIDE values").)   Second is "Essential Functions and Responsibilities," which essentially assesses job competency.  (*E.g.*, *id*. at 35–37.)   Third is "Operational Goals."  (*E.g.*, *id*. at 38–39.)   Each of these metrics contains sub-metrics, which are each rated 0 (unsatisfactory), 1 (continued development), 2 (meets expectations), 3 (commendable), or 4 (outstanding).  (*E.g.*, *id*. at 34.)   A score of 1 or "continued development" means the employee's performance "achieves only the minimum standards and expectations . . . but improvement is needed and expected." (*Id*.)  The performance appraisal form gives the clinic manager an opportunity to make comments at the end and for each sub-metric.

For Abebe's performance in 2015, then-clinic manager Genia Greiner gave Abebe a total weighted average of 2.0.  (*Id*. at 29–33.)   Greiner said Abebe "made great strides in her career growth this year." (*Id*. at 33.)

For Abebe's performance in 2016, then-clinic manager Karla Muskus gave Abebe a total weighted average of 2.27.  (ECF No. 29-2 at 34–40.)   Under the sub-metric for "Respect," for which Abebe received a score of 1, Muskus commented, "Sometimes I notice that outside concerns or problems take over her[,] changing her attitude and affecting her interaction with co-workers. I will encourage her to work on this and enforce Eskenazi Values." (*Id*. at 35.)  At the end of the form, Muskus praised Abebe's strides in other criteria but said, "I will encourage her to work on her personal issues that are affecting her interaction with co-workers to be continue [sic] a great value asset for our team." (*Id*. at 39.)

3

On April 19, 2017, Abebe received corrective discipline for a conflict that happened earlier that month. (ECF No. 29-4 at 53–54.) Abebe had approached a co-worker and asked the co-worker, "Do you have a problem?" (*Id.*) The two proceeded to argue in the presence of patients, a new employee, and other co-workers. (*Id.*) The corrective discipline form notes that Abebe violated Eskenazi's values for professionalism, respect, and excellence. (*Id.*) She received only a verbal warning. (*Id.*)

For Abebe's performance in 2017, then-clinic manager Felgrace James gave Abebe a total weighted average of 2.22. (*Id.* at 41–47.) James rated Abebe a 2 in "Professionalism," but noted, "For the most part, Lily is a personable lady, but when she gets upset, her attitude turns to shocking. Lilly [sic] needs to balance her personality out and not react so much to negative events or pressure that affects her interaction with co-workers." (*Id.* at 41–42.) James also rated Abebe a 1 in "Respect." (*Id.* at 42.) She wrote, "Lily has improved but last year she did not show respect interacting with a co-worker at the clinic in front of others [sic] staff members and patients, this situation resulted with many of Lily's coworkers seeing her as unapproachable. I will encourage her to continue to work on cultivating good relationships with her co-workers." (*Id.*) Abebe received several 1 ratings under "Essential Functions and Responsibilities," as well. Under the sub-metric "Role models Eskenazi health mission, vision, and shared values," James rated Abebe a 1 and wrote, "Lily needs to understand that supportive care for the patients means create and maintain a positive clinic environment, always enforcing Eskenazi values with patients, doctors and Co-workers." (*Id.* at 43.) Under the sub-metric "Supports

the team members to accomplish daily activities," James rated Abebe a 1, commenting, "Lily is very good at individual tasks, but she falls short in cooperating with co-workers. I recommend her to improve in her teamwork skills." (*Id*.) Under the sub-metric "Assists others when needed," Abebe received a 1, and James wrote, "Assisting others and team work needs to be an area to focus in 2018." (*Id*.) Furthermore, James commented for various other sub-metrics that Abebe could offer to help the dental hygienists when she was not busy, could "improve on her teamwork skills," and could "more engage on the performing of the Dental Assistant duties . . . ." (*Id*. at 44–45.)  In conclusion, James said she would encourage Abebe to work on her "personal issues." (*Id*. at 46.)

### C.  *2018–2019*

Several events at Grassy Creek occurring in 2018 and 2019 are relevant to this case.

#### 1.  Needle Incident

In March 2018, a white dental hygienist had been working at Grassy Creek for about three years. (Abebe Dep. Tr. 65:2–5, 135:15–21, ECF No. 34-2.)  One day, this hygienist administered a local anesthetic to a patient using a needle and syringe in preparation for a dental procedure Abebe was staffing. (*Id*. at 137:4–12.)  Abebe had left the room momentarily, and she returned to find suction hoses on the ground and an uncapped needle and syringe on the counter. (*Id*. at 137:14–22, 142:1–2.)  Fellow dental assistant Daisy Sierra was in the room, along with the patient. (*Id*. at 137:14–22.)  The hygienist, however, was not, so Abebe asked Sierra what had happened; she

responded that she did not know.  (*Id.* at 138:4–6.)  Abebe then went to find the hygienist and asked her what had happened; the hygienist reportedly said, in effect, "I did that so you can clean it up."  (*Id.* at 138:6–8.)  Shocked and angry, Abebe immediately called the clinic manager at the time, Felgrace James, and reported the incident to her.  (*Id.* at 138:19–139:3.)  James came to Grassy Creek to conduct an investigation.  (*Id.* at 139:8–13.)

Sometime before August 2018, the hygienist stopped working at Grassy Creek. (*Id.* at 156:5–6.)  On August 27, 2018, Abebe emailed James, asking for a copy of the incident report:

> Hi, just wanted to ask if I can get the report on the day I called to let you know that [the hygienist] had left an open needle that was used on a patient intentionally. I would like to have it if possible for my record.

(ECF No. 29-2 at 48.)  Abebe says she wanted the report essentially because she was involved in the needle incident and because she was curious if the needle incident had caused the hygienist's departure from the office.  (Abebe Dep. Tr. 156:24–157:7, ECF No. 34-2.)  James replied the next day, copying Hernandez—who had replaced James as clinic manager in the interim, with James acting as the area director (Hernandez's supervisor)—and Dr. Lane:

> I'm curious why you want a report? You can make your own note about the incident. What I can share with you is that as a group, we met and discussed about it. As a reminder, we need to be careful with the choice of words we use such as accusing [the hygienist of] leaving the open needle intentionally.
>
> If you need further discussion, please reach out to Carlos and/or Dr. Lane.

(ECF No. 29-2 at 48.)

Shortly after James's reply, Hernandez reached out to Abebe to set up a meeting between them and Dr. Lane. (Abebe Dep. Tr. 162:13–18, ECF No. 34-2.) Abebe told Hernandez about the situation with the hygienist, and Abebe requested the incident report again, to no avail. (*Id*. at 163:21–164:7.) Hernandez was "persistent" that Abebe should stop asking for the report because providing it would only "open[] up a can of worms." (*Id*. at 164:5–7, 165:13–17.) He told Abebe to simply trust that her supervisors had handled the situation. (*Id*. at 164:21–23.) Similarly, Dr. Lane told Abebe not to worry about it because the hygienist was gone anyway; he asked rhetorically whether Abebe wanted "a report of everybody that day." (*Id*. at 164:8–13.)

### 2. Dr. Salvador

Recall that Dr. Salvador is the other dentist at Grassy Creek, apart from Dr. Lane. Abebe says that she had experienced personal problems with Dr. Salvador in the past, including "many" instances of communicating in a rude way and "push[ing]" Abebe "at least three times." (Abebe Dep. Tr. 185:4–5, ECF No. 34-2.) Abebe saw Dr. Salvador treating other dental assistants poorly, too—Dr. Salvador pushed Richard Branham, as well as "everyone [else] in the clinic." (*Id*. at 183:12–15, 184:2–3.) Despite Dr. Salvador's rude behavior, Abebe says she did not report it for a long time because she "thought [Dr. Salvador] would stop doing what she does." (*Id*. at 185:18–22.)

However, on December 5, 2018, Abebe emailed Hernandez, Dr. Lane, and site coordinator Leah Coe to report that Dr. Salvador had been "very rude" to Abebe that

morning because of Abebe's perceived shortcomings in registering patients and had "screamed" at Abebe to bring a patient back for treatment.  (ECF No. 29-2 at 50.)  Abebe says that there "was a lot of confusion" and that it "was hard to work with Dr. Salvador that day."  (Abebe Dep. Tr. 178:10–21, ECF No. 34-2.)

On December 10, 2018, Abebe emailed Coe, "Dr. Salvador has pushed me multiple times and spoken to me in a very rude way. I do not feel comfortable to assist her." (ECF No. 29-2 at 51.)

Having been out of office for several days, Hernandez returned to Grassy Creek on December 10.  (Abebe Dep. Tr. 179:2–13, ECF No. 34-2.)  He and James met with Abebe and other employees the afternoon of December 11, and they addressed the matter with Dr. Salvador.  (ECF No. 29-2 at 50.)  Abebe confirms that she has had no issues with Dr. Salvador since then and that she now feels comfortable working with Dr. Salvador.  (Abebe Dep. Tr. 191:11–23, 196:21–25, ECF No. 34-2.)

   3.  <u>Dental Burs</u>

Another incident the parties mention involves dental burs, a tool used to assist with filling cavities.  (Abebe Dep. Tr. 197:11–16, ECF No. 34-2.)

In March 2019, Hernandez implemented a new protocol for tracking dental burs, by which an employee signed a form to check out a dental bur.  (Hernandez Decl. ¶ 7, ECF No. 29-3.)  There had been problems losing certain reusable burs after sterilization.  (Abebe Dep. Tr. 198:7–11, ECF No. 34-2.)  Initially, dental burs were stored in Daisy Sierra's work room.  (Hernandez Decl. ¶ 7, ECF No. 29-3.)  When Abebe sought to check out a dental bur, Sierra asked Abebe to sign a form, pursuant

to the protocol.  (*Id.*)  Abebe became upset because she felt she didn't have access to the burs "in the same way Daisy had."  (Abebe Dep. Tr. 206:17–23, ECF No. 34-2.) Abebe requested a meeting with Hernandez and the union representative Linda Murff to discuss the protocol.  (*Id.* at 202:12–22.)  Hernandez apologized, and the form protocol was never used again.  (Hernandez Decl. ¶ 7, ECF No. 29-3.)  Hernandez describes Abebe's demeanor that day as "hostile."  (*Id.*)

    4.  2018 Performance Appraisal

On March 29, 2019, Hernandez met with Abebe to review her performance in 2018.  (ECF No. 29-2 at 59.)  Giving Abebe a total weighted average of 1.43, Hernandez noted Abebe's communication and teamwork issues.  (*Id.* at 54–59.) Hernandez rated Abebe a 1 for "Professionalism," commenting that she needed to "improve the way [she] approached other team members and solve conflict the proper ways without become [sic] personal to others . . . ."  (*Id.* at 55.)  Likewise, Hernandez rated Abebe a 1 for "Respect," noting she was "still developing communication skills with the team to . . . resolve day to day issues."  (*Id.*)  For the sub-metric "Excellence," he also rated Abebe a 1, writing "Employee struggles with attendance, this is a recurring issue for the employee."  (*Id.*)  Under "Essential Functions and Responsibilities," the theme was the same.  Hernandez rated Abebe a 1 under the sub-metrics "Role models Eskenazi Health mission, vision, and shared values" and "Works independently as well as part of a professional team."  (*Id.* at 56–57.) Hernandez commented that Abebe "struggles with team work and communication" and pointed to "many occasion[s]" Abebe "struggle[d] adapting to new team members

and communicating" professionally. (*Id.* at 56.) Finally, Hernandez determined—without comment—that Abebe did not meet the "Operational Goals" of "Patient waiting time" and "Telephone Abandonment Rate." (*Id.* at 59.) Overall, Hernandez remarked, "Employee still developing communication and team work skills. . . . For 2019 employee needs to work on developing better professional relations with the team, better communication, addressing issues properly on [sic] a respectfully [sic] manner to others." (*Id.*)

By affidavit, Hernandez confirms that these scores were "based upon Abebe needing to improve and develop her communication skills, ability to work well with others, and conflict resolution with team members." (Hernandez Decl. ¶ 4, ECF No. 29-3.)

At the March 29, 2019 meeting, Abebe asked for the basis of her low scores in many of the metrics. (Abebe Dep. Tr. 217:9–12, ECF No. 34-2.) Hernandez "explained to Abebe that she had experienced conflict with multiple team members and how she handled the incidents and communicated with team members and management were the reasons for her 'continued development' scores." (Hernandez Decl. ¶ 8, ECF No. 29-3.) Hernandez specifically mentioned Abebe's handling of the needle incident. (Abebe Dep. Tr. 217:9–12, ECF No. 34-2.) Abebe vigorously disputed that she had "accused" the hygienist of misconduct; in her view, she rightly pointed out such misconduct. (*Id.* at 218:1–9.) Hernandez says,

> The fact that Abebe complained about the needle incident or about Dr. Salvador was not the problem. However, the way she complained about the needle incident and her interaction with Dr. Salvador—using a disrespectful and angry tone, gossiping, and making repeated accusations even after

10

matters were addressed by management—were examples of an ongoing problem.

(Hernandez Decl. ¶ 6, ECF No. 29-3.)

In 2019, Eskenazi Health announced merit-based pay raises based on employee performance in 2018, effective June 2, 2019.  (ECF No. 30-1 at 1.)  Employees who received a total weighted average of 2.0 or higher on their 2018 performance appraisals were eligible for raises of about 2.0%.  (*Id*.; Young Decl. ¶ 9, ECF No. 29-4.)  Abebe did not receive a raise for her 2018 performance.  (*Id*. ¶ 10.)

5.  <u>Series of Meetings</u>

After the performance review, Abebe initiated a series of meetings related to the 2018 performance appraisal.

On April 4, 2019, Abebe emailed union representative Linda Murff and Eskenazi human resources staffer Elizabeth Umbreit about Abebe's recent meeting with Hernandez and the performance review.  (ECF No. 29-2 at 60.)  She mentioned the dental burs situation, the needle incident, and her past problems with Dr. Salvador, saying these were not "being resolved" and were "creating a hostile work environment."  (*Id*.)

On May 24, 2019, Abebe emailed James, Hernandez, Eskenazi chief operating officer Melinda Rosa, and copied Murff and union president Eva Miles.  (*Id*. at 62.)  Abebe requested a meeting "to discuss concerns I have regarding breach of confidentiality."  (*Id*.)  Abebe was referring to the fact that Hernandez discussed the needle incident with Abebe during their meeting, which Abebe considered to be a breach of confidentiality: "I wasn't supposed to be talking about that, in general, so I

11

didn't understand why Carlos was bringing it up then." (Abebe Dep. Tr. 227:9–11, ECF No. 34-2.) James, Hernandez, Murff, and Umbreit met with Abebe twice in June 2019. (*Id.* at 229:10–17.) Abebe felt that Hernandez had "bullied" her by bringing up the needle incident during her performance appraisal. (*Id.* at 231:3–8.)

On August 20, 2019, Abebe emailed Miles. (ECF No. 29-2 at 63.) She laid out in detail her account of the needle incident and the fact that Hernandez mentioned the incident, among other things, during her performance appraisal meeting. (*Id.*) She said Hernandez was bullying and intimidating her, citing him recently attempting to discipline her for attendance issues that she disputed and asking her to stay until 5 p.m. when co-workers were purportedly able to leave at 4:54 p.m. (*Id.* at 64.) She asked Miles whether she could get a copy of the report of the needle incident. (*Id.*) She requested a review of her performance appraisal. (*Id.*) And, she noted the significant anxiety she was experiencing due to all of the aforementioned incidents at work. (*Id.*)

On August 22, 2019, James, Hernandez, Murff, and Umbreit met with Abebe "to address and finalize Lily's ongoing concerns" about her 2018 performance appraisal, but the meeting agenda comments that Abebe still was "not articulating what she wants." (ECF No. 29-4 at 59.) Murff indicated to Abebe beforehand that this would be the "last meeting on this issue" and advised that Abebe figure out exactly what she wanted out of the meeting. (Abebe Dep. Tr. 241:17–25, ECF No. 34-2.)

Still, Abebe was not satisfied. On August 23, 2019, she emailed Miles again that she felt like "nothing was resolved" by the previous day's meeting. (*Id.* at 244:12–22.)

### D. Allegation of Discrimination

Abebe concedes no one at Eskenazi has ever made untoward comments about her race or national origin.  (*Id*. at 260:8–20, 262:25–263:4.)

Abebe first contacted the Equal Employment Opportunity Commission ("EEOC") on August 30, 2019.  (*Id*. at 246:4–23.)  She told her EEOC investigator about the needle incident and her suspicion that Eskenazi was "upset with her for continuing to ask to see the report for the needle incident."  (*Id*. at 247:1–8.)  The investigator explained the laws the EEOC enforces and informed Abebe that she had not identified discrimination based on membership in a protected class.  (ECF No. 29-2 at 66.)

On September 4, 2019, Abebe spoke with the investigator again.  (*Id*.)  For the first time in this saga, Abebe alleged she had suffered race- and national origin-based discrimination at work.  (*Id*.)  She told the investigator about the needle incident, the dental burs incident, and her previous conflicts with Dr. Salvador.  (*Id*. at 65.)  The EEOC investigator advised Abebe there was likely no cause for further EEOC investigation:

> By [Abebe's] own admission, her job performance is suffering due to her inability to move on from the needle incident. She failed to identify any EEOC basis until advised that what she complained of is not covered under the laws enforced by this agency. I advised [Abebe] that there is a chance that her charge will be Dismissed and a [Notice of Right to Sue] issued to [her] which will allow her to file suit in Federal Court, within 90 days of the date of the Notice, if [she] wants to pursue her charge . . . .

(*Id*. at 66.)

On January 15, 2020, Abebe commenced this case against Eskenazi.  She brings claims of race and national-origin discrimination and retaliation under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  She also seeks punitive damages under 42 U.S.C. § 1981.  Eskenazi moves for summary judgment.  (ECF No. 29.)

## II.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim."  *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169).  If the movant discharges her initial burden, the burden shifts to the nonmovant, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of her case.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  The Court construes all facts and any reasonable inferences arising from the facts in favor of the nonmovant.  *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

## III.    Discussion

### A. *Race and National Origin Discrimination*

In employment discrimination cases under Title VII, "when a defendant moves for summary judgment, the singular question for the district court is whether the

14

plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (cleaned up).  The analysis under 42 U.S.C. § 1981 is "essentially identical" to that under Title VII, *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996), so the Court will discuss only Title VII.

There are several accepted ways to frame that inquiry.  One is the well-known *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under this framework, the "plaintiff carries the initial burden of establishing a prima facie case of discrimination, which can be accomplished by setting forth evidence that: (1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017) (cleaned up). "Once established, this prima facie case creates a presumption of discrimination, and the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment decision." *Id*. (cleaned up). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id*. (citations omitted).

The Seventh Circuit has warned district courts not to use the *McDonnell Douglas* burden-shifting framework in a way that distracts from the broader inquiry at summary judgment. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards"). "In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

The Court will employ the *McDonnell Douglas* burden-shifting framework here. Abebe's theory is that Eskenazi denied her a raise for her performance in 2018 because of her race and national origin and not because of alleged problems with communication, professionalism, and teamwork. There is no doubt that Abebe, a black person of Ethiopian descent, is a member of at least two protected classes. (Abebe Dep. Tr. 10:9–22, ECF No. 34-2.) And, at least where raises are "the norm for workers who perform satisfactorily," which seems to be true of Eskenazi's raises, the denial of a raise can be an adverse employment action. *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000).

But Abebe's case already becomes muddled at the question of whether she even deserved a raise by meeting Eskenazi's legitimate employment expectations in 2018. Eskenazi has adduced evidence that she did not, even if the parties' disputes over the phone abandonment rate operational goal is resolved in Abebe's favor. The main drivers of Abebe's 2018 performance appraisal were the low scores in several sub-

metrics of "Eskenazi Health's Values."   (ECF No. 29-2 at 54–59.)   According to Hernandez, Abebe exhibited poor conflict resolution and communication skills throughout the year.  (Hernandez Decl. ¶¶ 4, 8, ECF No. 29-3.)  When prompted for a specific example, Hernandez said Abebe's supervisors did not appreciate how she handled communications regarding the needle incident.  (*Id*. ¶ 6.)  Indeed, the record reflects that Abebe asked to see the hygienist's disciplinary report—once by email and once in a follow-up meeting—for no reason other than to satisfy her own curiosity. (ECF No. 29-2 at 48; Abebe Dep. Tr. 162:13–18, ECF No. 34-2.)  That could certainly be characterized as a form of "gossiping."  (Hernandez Decl. ¶ 6, ECF No. 29-3.)

Abebe argues that there is a continuing issue of fact as to whether she was subpar in communication, teamwork, and conflict resolution skills during 2018.  She points to her two-page affidavit, in which she maintains that she was never "disrespectful, gossipy, or confrontational."  (Abebe Aff. ¶¶ 3–5, ECF No. 34-1.)  The Court doubts this naked denial is sufficient evidence to raise a genuine dispute of material fact, or even competent evidence at that—Abebe does not explain how she has personal knowledge about how her *co-workers* perceive her allegedly poor manner of communication, whether or not she views herself as a terrific communicator.

Even if the Court were to find a continuing dispute of fact as to whether Abebe met Eskenazi's legitimate performance expectations, she has completely failed to identify similarly-situated comparators who were treated more favorably than she was.   "[T]he similarly-situated inquiry is flexible, common-sense, and factual." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  "It asks 'essentially, are there

17

enough common features between the individuals to allow a meaningful comparison?'" *Id*. (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).  Put another way, there must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination."  *Id*. (quoting *Humphries*, 474 F.3d at 405).  *Coleman* illustrates well how the comparator analysis works.  There, the U.S. Postal Service said it fired the plaintiff because she told her psychiatrist she was thinking about killing her supervisor.  *Id*. at 843. Alleging discrimination, the plaintiff—a black woman—showed that two white male employees at her facility had recently threatened another employee at knife-point, yet they had received only one-week suspensions from the same manager who fired the plaintiff.  *Id*. at 841.  The Seventh Circuit held the two white male employees were sufficiently similarly-situated comparators "to provide a 'meaningful comparison' and to permit a reasonable jury to infer discrimination."  *Id*. (citation omitted).

Abebe says fellow dental assistants Richard Branham (a white man) and Daisy Sierra (a Hispanic woman) are similarly-situated comparators.  Abebe points out that Branham had a "run-in" with Dr. Salvador yet "was not ever alleged to have done anything wrong by reporting the altercation with Dr. Salvador." (Pl.'s Resp. Opp'n at 9, ECF No. 34.)  And she points out that Sierra "was not required to sign the form for the burs." (*Id*.)  Even if these statements are true, it is not clear how they are relevant

18

to this case.  As to Branham's reporting of Dr. Salvador's pushing and screaming, Eskenazi has made clear that the issue was not that a report was made, but "the *way* [Abebe] complained about the needle incident and her interaction with Dr. Salvador—using a disrespectful and angry tone, gossiping, and making repeated accusations even after matters were addressed by management . . . ."  (Hernandez Decl. ¶ 6, ECF No. 29-3.)  Abebe has not adduced any evidence that Branham communicated about his problems with Dr. Salvador in an unsavory way. Furthermore, the dental burs situation happened in March 2019, (*Id.* ¶ 7); it is irrelevant to either Abebe's or Sierra's work performance in 2018, which is the focus of her suit.

A meaningful comparator would have been a co-worker at Grassy Creek who was alleged to communicate in a rude, disrespectful, or gossipy manner or to have teamwork problems throughout 2018 yet received a better performance appraisal than Abebe's and received a raise.  Neither Branham nor Sierra fits the bill.  Abebe has adduced no evidence that Branham's or Sierra's communicative mannerisms were off-putting.  She has adduced no evidence that either of them had issues working in a team.

Finally, say the Court ignored that Abebe has failed to establish a prima facie case of discrimination.  There is still a complete dearth of evidence establishing that Eskenazi's reasons for giving Abebe a low score on her 2018 performance appraisal were pretextual.  A plaintiff cannot prevail on an employment discrimination claim if her employer "honestly believed in the nondiscriminatory reasons it offered, even

if the reasons are foolish or trivial or even baseless." *Bell v. E.P.A.*, 232 F.3d 546, 550 (7th Cir. 2000). Abebe has adduced no evidence that could lead to the inference that Eskenazi lied about its reasons for giving Abebe a low score on her 2018 performance review. She argues that she has established pretext because Eskenazi's allegations that Abebe struggled with communication, teamwork, and intra-office conflict are too "vague" to credit. (Pl.'s Resp. Opp'n at 10, ECF No. 34.) But the Court does not find Eskenazi's reasons vague; they are supported by specific examples in communications regarding the needle incident and Abebe's reporting of Dr. Salvador's misconduct, a 2017 disciplinary citation noting Abebe argued in front of patients and co-workers, and the 2016 and 2017 performance appraisals noting similar communication and teamwork problems. (*See* Hernandez Decl. ¶ 6, ECF No. 29-3; ECF No. 29-4 at 34–47, 53–54.) In short, she had a documented history of communication and teamwork problems that did not improve in 2018 despite encouragement in her prior reviews to work on her personal interactions and cultivate good relationships with her co-workers. Yet, without explaining why, Abebe also argues that the Court should ignore as irrelevant every performance appraisal before 2018. (*Id.*) But earlier performance appraisals are manifestly relevant to the pretext inquiry because, if the communication and teamwork problems noted therein are consistent with later performance appraisals, the earlier appraisals tend to show that Eskenazi's reasons for giving Abebe a low performance appraisal in 2018 are not pretextual.

In sum, Abebe's claim of discrimination on the basis of her race and national origin fails on multiple levels. No reasonable jury could find on this record that Eskenazi

discriminated against her based on her membership in a protected class, and Eskenazi is entitled to judgment as a matter of law.

## B. Retaliation

To survive summary judgment on her retaliation claim, Abebe must present evidence (1) that she engaged in an activity protected by Title VII; (2) that she suffered a materially adverse action taken by Eskenazi; and (3) that there is a causal connection between the two. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009). For purposes of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

According to Abebe, Eskenazi retaliated by threatening to place her on a "Performance Improvement Plan" ("PIP") in September 2019.  (Pl.'s Resp. Opp'n at 11, ECF No. 34 (citing Abebe Dep. Tr. 256:16–19, ECF No. 34-2).)  Recall that Abebe spoke with an EEOC investigator on August 30, 2019, and September 3, 2019.  (ECF No. 29-2 at 66.)  "The purpose of a PIP is to identify unacceptable behaviors and job performance, outline the employee's responsibilities, and provide steps to improve behavior and job performance."  (ECF No. 29-4 at 15.)  Although a PIP may be implemented "in connection with discipline," the plan itself is not treated as discipline.  (*Id*. ("PIPs are not subject to either the union grievance procedure or the employee dispute resolution procedure."); *id*. at 19–21 (not listing PIP as one of the six forms of corrective discipline).)  Thus, a PIP is not discipline, but a step removed

21

from discipline, at worst.  Even if it were discipline, the discussion about a PIP did not lead to the imposition of a PIP.  So, Abebe's theory is that a *discussion* about a non-disciplinary improvement plan was a materially adverse employment action.  It simply is not.

Moreover, Abebe does almost nothing to causally connect the discussion about the PIP to her act of talking to an EEOC investigator aside from pointing to the suspicious timing of the PIP discussion vis-à-vis her conversation with the EEOC.  Suspicious timing must normally be accompanied by corroborating evidence to sustain a retaliation claim past summary judgment.  *See Coleman*, 667 F.3d at 861–62.  Abebe says her case is like *Stepp v. Covance Central Laboratory Services, Inc.*, 931 F.3d 632 (7th Cir. 2019).  In *Stepp*, a temporary worker complained about racism in the workplace and then was denied an expected promotion to a permanent position despite other co-workers' promotions.  *Id*. at 635.  The Seventh Circuit held that the temporary worker had adduced sufficient evidence of a causal nexus for purposes of his retaliation claim, citing the suspicious timing of the denial combined with differential treatment of comparators and the employer's facially unbelievable explanation (that a "hiring freeze" prevented the plaintiff's promotion when such freeze occurred months after the timeframe during which the plaintiff would have been promoted).  *Id*. at 635–36.  Beyond suspicious timing, Abebe has not adduced similar corroborating evidence.  As explained above, *see supra* Section III.A, she has not identified meaningful comparators who were granted raises despite communication and teamwork problems comparable to Abebe's.  Nor has Abebe

shown that Eskenazi's reasons for her low scores on her 2018 performance appraisal are facially unbelievable.  *See supra* Section III.A.

Like her discrimination claim, Abebe's retaliation claim fails on multiple levels. Eskenazi is entitled to judgment as a matter of law on the retaliation claim.

## IV.   Conclusion

Abebe's disagreements with her supervisors and co-workers do not necessarily sound pleasant.  But, overall, this case reads like a series of complaints about matters that fall within the range of everyday workplace indiscretions.  "Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006).  That is, this Court is not a "super-personnel department" entrusted to review an employer's every business decision—only those decisions, in the context of Title VII, that reflect discrimination based on an employee's membership in a protected class.  *Id.* (citation omitted). Because there is insufficient evidence of that here, Eskenazi's motion for summary judgment, (ECF No. 29), is **granted**.  Abebe's discrimination and retaliation claims under Title VII are **dismissed with prejudice**.  Final judgment shall issue in a separate order.

**SO ORDERED**.

Date: 8/11/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

23

Distribution to registered parties of record via CM/ECF.